**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | **CASE NO. 20-CR-55 (TFH)** |
| : | |
| **JACOB KYLE JORDAN,** : | |
| : | |
| **Defendant.** : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S**
**SECOND EMERGENCY MOTION FOR BOND REVIEW**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia and undersigned counsel, respectfully submits this omnibus opposition to Defendant's "Emergency Motion for Bond Review." (Docket Entry 23). For reasons stated below, the government submits that the motion should be denied. In support, the government relies on the following factual and legal authority, as well as any that may be offered at a hearing on these motions.

**PROCEDURAL HISTORY**

The United States orally moved for detention pending trial at Defendant's initial appearance on February 26, 2020. On February 27, 2020, a federal grand jury sitting in the District of Columbia returned an indictment charging Defendant with one count of Possession with the Intent to Distribute more than 500 grams of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), and one count of Possession of a Firearm in Furtherance of Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c)(1). A detention hearing was held on February 28, 2020, at the conclusion of which, Magistrate Judge Meriweather ordered Defendant detained pending trial. (Docket Entry 13).

Defendant appealed that order to this Court on March 5, 2020, and the United States opposed. (Docket Entries 16, 17). On March 11, 2020, this Court heard oral argument and denied Defendant's motion for pretrial release on the grounds that he is a danger to the community. Minute Entry, March 11, 2020. On March 19, 2020, this Court continued Defendant's scheduled status conference pursuant to Chief Judge Howell's standing order. (Minute Entry, March 19, 2020).

Defendant filed an Emergency Motion to Review the Pretrial Detention Order on March 19, 2020, and filed a Supplement to that Motion the following day. (Docket Entries 19, 21). The government filed its Opposition to Defendant's Motion on March 23, 2020. (Docket Entry 22). The Court heard oral argument by teleconference on March 23, 2020, and ruled that Defendant would remain detained pending trial. (Minute Entry, March 23, 2020). The Court noted that Defendant could renew his Motion if the situation warranted it. Defendant filed his Second Motion for Review of the Pretrial Detention Order on March 30, 2020. (Docket Entry 23).

## ARGUMENT

A defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider its decision regarding pretrial detention "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time and that has a material bearing on the issue" of whether there exist conditions for release that would "reasonably assure the appearance of such person as required." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014) (citing 18 U.S.C. § 3142(f)(2)(B); accord *United States v. Moore*, No. 13–330, 2014 WL 1273439, at *1 (D.D.C. Mar. 31, 2014)).

The defendant argues that the impact of COVID-19 merits release in his case because he has tested positive for the flu, and because he is "at a particular risk of contracting COVID-19 based on proximity to individuals who have tested positive and at particularly high risk for other medical issues based on his mental health needs, which continue to go untreated." (Docket Entry 23, at 5). The key question before the Court however, in fact, is whether there is anything about the defendant *in particular*, rather than the mere existence of COVID-19 as a generality, that uniquely presents this Court with such changed circumstances that would warrant reconsideration of detention. In this case, the new information on the COVID-19 pandemic does not materially bear on any of the detention factors set forth in 18 U.S.C. § 3142(g) under the circumstances here. Moreover, the risk of harm in this case does, in any event, warrant release.

### I.   The Bail Reform Act factors, considered by Magistrate Judge Meriweather and this Court remain in favor of detention.

The United States requested Defendant's pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(E), because the crimes charged included the possession or use of a firearm, and 18 U.S.C. § 3142(f)(1)(C), because Defendant's maximum term of imprisonment exceeds ten years under the Controlled Substances Act.[1] Following separate hearings on the issue, Magistrate Judge Meriweather and this Court both agreed that there was no combination of conditions that would guarantee the safety of the community of Defendant was released. (Docket Entry 13); Minute Entry, March 11, 2020.[2]

---

[1] As noted during oral argument, Defendant faces a mandatory-minimum sentence well in excess of 10 years.

[2] Both this Court and Magistrate Judge Meriweather determined that Defendant should be detained on dangerousness grounds and did not determine whether Defendant should also be detained as a flight risk.

In weighing Defendant's motion, this Court must consider the same statutory factors it has already considered: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community, and the risk of flight, which would be posed by the defendant's release. 18 U.S.C. § 3142(g). Respectfully, there has been no change in these factors, or the fact that – on balance – they weigh in favor of pretrial detention.

As noted by Judge Ketanji Brown Jackson on March 30, 2020, "the sole issue that this Court must decide when addressing [Defendants] emergency release request is whether the new circumstance of the COVID-19 pandemic has 'a material bearing' on Magistrate Judge Meriweather's prior detention determination." *United States v. Lee*, Case No. 19-CR-298 (D.D.C. March 30, 2020), *Memorandum Opinion & Order Denying Emergency Motion for Release* (Docket Entry 25, at 7-8). In weighing arguments identical to Defendant's regarding the dangers posed by COVID-19, Judge Jackson held that "this Court doubts that the COVID-19 pandemic has any material impact on the section 3142(g) factors that led Magistrate Judge Meriweather to determine that pretrial detention was warranted. . . ." *Id*. at 8. The United States respectfully submits that the same is true in this case.

Judge Timothy J. Kelly held similarly on April 1, 2020, noting that "The Court certainly appreciates the extraordinary nature of the current public health crisis. However, <u>even a heightened risk of infection is but one factor that the Court must balance against others</u>." *United States v. Lin*, Case No. 19-CR-387 (D.D.C. April 1, 2020), *Order Denying Emergency Motion to Review and Vacate Detention Order* (Docket Entry 34, at 4) (emphasis added) (citing *United States v. Harris*, No. 19-356, 2020 WL 1503444 (D.D.C. Mar. 27, 2020)).

Defendant contends that he should be release because he faces a heightened risk of infection from COVID-19 because "[o]ne of the inmates who has tested positive for Coronavirus was in a cell near Mr. Jordan's and they were in close enough contact that they shared food." (Docket Entry 23, at 5). The United States is aware that all of the COVID-19 positive inmates are housed in the Central Treatment Facility (CTF). If, as Defendant contends, he has been in close proximity to infected inmates inside CTF, there is a meaningful risk that Defendant has been exposed and may not become symptomatic until he is released into the community

Nevertheless, Defendant urges the Court to release him because he does not feel safe at CTF. While the government is not unsympathetic to Defendant's claims, Judge Jackson addressed this precise argument in her *Lee* opinion, and noted that:

> accepting this argument would require the Court to ignore the fact that the relevant statutory inquiry is *not* the benefits that a defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial). Rather, the statute requires the Court to evaluate "*the danger*" that "would be posed *by the person's release*." 18 U.S.C. § 3142(g)(4) (emphases added). And, truth be told, the dangers that Lee's release poses in the age of COVID-19 are substantial, insofar as they include not only the risk that he will continue to engage in the same types of unlawful and potentially dangerous conduct that led to both his initial conviction and the charge of unlawful firearms possession that is at issue in this case, but also the heightened safety risks that his release poses to the probation officers who would be tasked with monitoring his behavior while he is out of jail on pretrial release.

*Lee*, (Docket Entry 25, at 9) (emphasis added).

As the Court is aware, Section 3142(i) operates independently of the detention factors and authorizes the Court to temporarily release a defendant to the custody of another if it finds a "compelling reason" that necessitates temporary release. Respectfully, the existence of the pandemic in and of itself is not a compelling reason to justify release. Moreover, according to the

5

D.C. Department of Corrections (DOC), DOC appears to be have undertaken several steps to try to prevent the spread of COVID-19 within its facilities.

The only real basis for the defendant's request for release is the existence of the COVID-19 pandemic. While the COVID-19 pandemic is obviously startling, the government still has a duty to ensure the safety of the community and balance the security of others with the safety of the defendant. In other words, unless this or any court is willing to release all defendants, or defendants with verified vulnerabilities, regardless of their danger and/or risks, the Bail Reform Act still provides a meaningful framework to analyze the defendant's motion. As described earlier, the defendant's chief argument is that he should be released because has been diagnosed with the flu, has not received his mental health medication, and is in close proximity to inmates who have tested positive for COVID-19. As part of this argument, he notes that there is now a positive COVID-19 in DOC. Respectfully (and sadly), this should come as no surprise to the Court or the parties. The idea that DOC would emerge unscathed from a global pandemic is doubtful. The real inquiry is the balance of interests.

As this Court is likely aware through prior filings, the government has endeavored – on a case-by-case basis and as a result of the public health crisis currently pending – to permit temporary release pursuant to 18 U.S.C. § 3142(i) or 18 U.S.C. § 3145(c) to those who actually need release.[3] Here, it is unclear as to how any of the circumstances cited in his motion, in this context, at this time, and with this charge, necessitates release under these circumstances. Furthermore, the

---

[3] For example, in *United States v. Carl Courtney*, 19-cr-413 (TJK), the government consented to release where the defendant had open wounds and was scheduled for surgery. In *United States v. Larry Key*, 19-cr-292 (JDB), the government consented to release due to the defendant's advanced age, his lung, heart, and kidney disease, and current multiple hospitalizations. The government is sincerely trying to balance the danger of the offender and the pandemic, but cannot ignore a person's record, their conduct, or their alleged or unverified maladies.

defendant has not offered any rationale for why release into a community that is already affected by the virus will protect either individual any more than their current placement at the Department of Corrections.

**The D.C. Jail**

In preparing to respond to these and other similar motions, the United States Attorney's Office has consulted with DOC to obtain relevant information as to its handling of the public health crisis, and passes this information along to the Court for its consideration. Indeed, this office continues consulting with the DOC in light of the rapidly-changing situation. Based upon the information provided to the government at present, it appears that DOC is handling the situation as well as it can – no different than any organization in the United States that is trying to weather this pandemic. Unless and until that changes, the government cannot endorse wholesale release of dangerous defendants.[4]

Specifically, as of March 27, 2020, according to DOC, DOC has done the following to ensure the safety of its incarcerated population: (1) banned all non-attorney visits to limit unnecessary exposure; (2) implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.; (3) if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing.

---

[4] The government is aware of reports from local unions and the Fraternal Order of Police that DOC is derelict of its duties to its employees. *See* March 29, 2020 Press Release from Fraternal Order of Police Department of Corrections Labor Committee (describing DOC's failures to follow CDC guidance). On March 30, 2020, the ALCU and D.C. Public Defender Service sued DOC for what it claims are violations of the Fifth and Eighth Amendments. That case is assigned to Judge Colleen Kollar-Kotelly. DOC has not yet responded to the allegations and complaint.

While the government shares the concerns of others, we have been unable to independently verify these claims. We will continue to update the Court of all information – positive or negative – as the information is made available to the U.S. Attorney's Office.

Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days; (4) DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus; (5) DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.; (6) DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control; (7) DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations; (8) DOC checks and rechecks its ventilation system to ensure the air quality in the facilities; (9) DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses weekly to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours; (10) DOC would like to limit the number of inmates coming into its facility at any given time; and (11) upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change. *See also* Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how DOC has suspended in-person visitations, enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19). While the government shares the defendant's concerns over the potential risk to the prison population, it remains unclear to undersigned counsel what, if any, precautions this defendant would be able to put in place to protect himself and those around him from COVID-19 if he were to be released. *See also United*

8

*States v. Edwards*, 20-mj-50, at *6 (RMM) (March 30, 2020 D.D.C.) ("Although [the defendant's] alleged health problems may make him at heightened risk if he contracts the coronavirus, he would be at risk even if he were not incarcerated."). Moreover, any such circumstances must also protect the public from a dangerous defendant who appears committed to—and undeterred from—reoffending.

Indeed, while reports of positive cases within CTF have increased, such reporting would also seem to support a conclusion that steps are being taken to protect the population currently incarcerated there. Specifically, on March 26, 2020, the government learned that DOC reported its first COVID-19 positive test at CTF to the courts. The inmate was immediately placed into isolation and monitored. DOC and the D.C. Department of Health also began to contact trace, to determine who, if any, had contact with the inmate. DOC has previously handled possible COVID-19 cases with similar procedures.[5] As of April 1, 2020, the government learned that the total number of positive persons is 8 and all have been placed in quarantine.[6] As this Court is likely well aware, the possibility of COVID-19 – a global pandemic – reaching DOC was always a realistic possibility. But based on the information from DOC, DOC appears to be taking this pandemic seriously, and complying with D.C. Dept. of Health mandates regarding how to handle positive tests and symptomatic patients. Respectfully, DOC cannot be reasonably expected to stave off a pandemic that has affected all aspects of life in the United States.

---

[5] For example, two weeks ago, a Deputy United States Marshal in D.C. Superior Court tested positive for COVID-19. As a result of this positive test, DOC followed its protocols outlined above. Every inmate who might have been exposed to the deputy was placed in quarantine. Of the quarantined inmates, a single inmate became symptomatic, and later tested negative for COVID-19. The remaining inmates nevertheless remained in quarantine to protect the remainder of DOC's population, until the quarantine was safely lifted.

[6] This number is likely to change as more tests are conducted.

It is undeniable that the government and the Court are faced with the difficult challenge—how to balance the security and safety of the community with the safety of the defendant. As of this moment, the government submits that defendant has not established that he has particularized health condition that puts him at heightened risk; nor has the defendant put forth a *bona fide* alternative to incarceration at DOC that would materially reduce the likelihood that defendant would contract and suffer serious health consequences from COVID-19. The government must also emphasize that the court must not lose focus on the importance of protecting the public and the § 3142 factors that weigh heavily in favor of detention here

This is not the first time a court has considered bond based on meaningful health emergencies. In *United States v. Johnston*, No. 17-46 (RMM), 2017 WL 4277140 (D.D.C. Sept. 27, 2017), the Court released a defendant for a limited purpose: to obtain surgical treatment. "This is a temporary release to home detention that is narrowly tailored to respond to the exigent and unusual circumstances presented by [the defendant's] cancer diagnosis and the status of his testing and treatment." *Id.* at *9. When the district court has previously reviewed a motion for release from pretrial detention for health conditions that can be treated at the jail, the court denied the motion, citing that a defendant's "history and characteristics" is only one of four factors that the Court must consider in determining the appropriateness of pretrial detention. *United States v. Parker*, 517 F. Supp. 2d 375, 377 (D.D.C. 2007) (defendant's medical conditions, including diabetes, asthma and hypertension, for which he required ongoing medication and treatment, cannot be dispositive in considering motion for release).[7]

As defendants continue to ask for release based on COVID-19, courts in this district have

---

[7] *See also United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (medical conditions can warrant temporary release under § 3142(i)).

begun to assess the validity of the various claims related to COVID-19 or the DOC. For example, in *United States v. Hill*, 19-cr-260 (APM) (D.D.C.), the defendant filed a motion for release. The Court denied the defendant's motion for release in a bank robbery case, without a hearing, noting:

> Defendant's release would present a danger to the community and that there is no condition or combination of conditions that would reasonably assure the community's safety. Although the court recognizes the danger presented by the coronavirus outbreak, and that older populations are more vulnerable, on balance release is not warranted at this time. The Department of Corrections is taking precautions to protect the inmate population, and there is not any reported case within the inmate population (to the court's knowledge). The court is prepared to reconsider this order should conditions change at the jail.

*Id.,* Minute Order, March 19, 2020; *But see United States v. Meekins*, 18-cr-222 (APM) (D.D.C. March 31, 2020) (finding that the balance of favors weighs in favor of release, considering COVID-19 pandemic and the defendant's underlying health conditions). In *United States v. Smith*, 19-cr-324 (BAH) (D.D.C. March 23, 2020), the Court – the same Court that issued Standing Order 20-9 that suspended most courthouse operations as a result of the pandemic – remarked that "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained . . . including suspending all in-person visits, programming, and volunteer activities within its facilities, enhanced cleaning efforts, especially within common areas, and vigilant medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14, 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although defendant is in an age group that may be more susceptible to the virus . . . this risk pertains whether the defendant were released or detained, and any heightened risk posed by pretrial detention does not outweigh the presumption in favor of detaining the defendant pretrial, nor does it alter the balance of the statutory factors Congress prescribed for determining the propriety of detention, which all continue to weigh heavily in favor of detention.

*Id.* (denying release in a child porn case). There is no reason to suggest that, despite the existence

of positive tests, DOC has abandoned its protocol and seeks to endanger its inmates.

While several district courts have already opined on the COVID-19 pandemic, it is clear that the analysis ultimately boils down to the defendant's danger, even in cases involving vulnerable health conditions. *See, e.g.*, *United States v. Gonzalez*, 20-cr-40 (BAH) (D.D.C. March 24, 2020) (denying release, noting the steps taken by DOC to protect inmates); *United States v. Antonio Tabron and Lamont Johnson*, 18-cr-112 (TFH) (denying release after trial in a PCP conspiracy case); *Lee*, 19-cr-298 (KBJ) (denying release in a firearms case based on generalized COVID-19 concerns); *United States v. Parker*, 19-cr-349 (APM) (D.D.C. March 30, 2020) (denying release after a 924(c) plea despite Eighth Amendment claim); *United States v. Watkins*, 20-cr-19 (CRC) (D.D.C. March 31, 2020) (Minute Order) (highlighting the §3142 factors and noting that a "generalized risk to otherwise healthy detainees" is not alone sufficient, denying release in a gun case); *United States v. Foster*, 17-cr-160 (RC) (D.D.C. March 31, 2020) (Minute Order) (discussing *Lee* and other relevant authorities but denying release in a postal robbery); *United States v. Lin*, 19-cr-387, at *4-5 (TJK) (D.D.C. April 1, 2020) (denying release in a aggravated identity theft conspiracy and noting that "even a heightened risk of infection is but one factor that the Court must balance" and finding the difference between COVID-19 pandemic at Rikers Island and D.C. jail to be "substantial"). *But see United States v. Harris*, 19-cr-356 (RDM) (D.D.C. March 26, 2020) (releasing defendant in a child porn case in part because of COVID-19 pandemic, along with the expert opinion signifying the defendant's limited danger); *United States v. Jaffee*, 19-cr-88 (RDM) (D.D.C. March 26, 2020) (releasing defendant because of COVID-19 pandemic but noting his prior perfect compliance with his conditions of release as well as weakened state evidence in a gun and drugs case); *United States v. Kofi Appiah and James*

12

*Hutchings Jr.*, 19-cr-361 (BAH) (D.D.C. March 26, 2020) (releasing defendants in a firearms conspiracy case because of underlying health conditions, including severe assault at jail and verified asthma). A close reading of each case suggests that the particulars of the defendant's circumstances guide the analysis. The pandemic, alone, is not a but-for cause of the defendant's release, even under 18 U.S.C. § 3142(i).[8]

Opinions filed in neighboring districts are in accord.[9] On March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on this very issue. *United States v. Martin*, 2020 WL 1274857, *2 (D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court nevertheless recognized that "resolving . . . an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's proposed

---

[8] *See also United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20-cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020).

[9] *But see United States v. Stephens*, 15-cr-95-AJN (S.D.N.Y. March 19, 2020) (COVID-19 outbreak and as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.*  Notably, the Court recognized that its decision cannot be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).")

use of GPS location monitoring even if the defendant was released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (E.D. La. March 19, 2020) ("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community").

In fact, the District of Maryland, Greenbelt Division – whose defendants are also detained by DOC – has almost uniformly denied such petitions on similar, generalized grounds. *See, e.g.*, *United States v. Adams*, 19-cr-257-003, at \*3-4 (DKC) (D. Md March 25, 2020) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Bilbrough, IV*, 20-cr-33, at \*4-5, 7 (TDC) (D. Md March 20, 2020) ("D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities. Although [the defendant] may still be at an increased health risk [from diabetes] . . . this factor alone does not outweigh the other factors."); *United States v. Brown*, 16-cr-553 (RDB) (D. Md March 26, 2020) (denial of release from BOP custody); *United States v. Jefferson*, 19-cr-487 (CCB) (D. Md March 23, 2020) ("Precautionary measures have been implemented at CTF in light of the COVID-19 pandemic" denying release to an asthmatic defendant); *United States v. Johnson*, 17-po-9262 (TMD) (D. Md March 20, 2020) (discussing general risk of exposure to COVID-19, but denial of release on other grounds); *United States v. Jones*, 17-cr-582, at \*2 (CCB) (D. Md   March 20, 2020) ("CDF medical personnel are adequately addressing Defendant's medical needs" and the COVID-19 "risks are not

the sole determinant of whether detention is appropriate."); *United States v. Legard*, 19-cr-137, at *2-3 (PWG) (D. Md March 24, 2020) (Asthma was not a basis alone to release a defendant in light of COVID-19 pandemic and that the measures at the D.C. jail are "in compliance with state and federal guidelines regarding protective measures"); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (D. Md March 21, 2020) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus."); *United States v. Perry*, 14-cr-181, at *1-2 (GLR) (D. Md March 26, 2020) (denial of release from halfway house due to COVID-19, but on statutory reasons, but also noting that the affidavit of Dr. Marc Stern "lack[ed] the case or institution specificity to determine, with sufficient certainty, the health risks posed at the institution."). In fact, in *United States v. Williams*, 13-cr-544 (PWG) (D. Md March 23, 2020), the Court even acknowledged that DOC has taken significant measures to stem the tide of the pandemic, but that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly." *Id.* at *5. Perhaps most explicitly, "[t]he existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained." *Id.* The Court thus denied a 67-year-old defendant emergency release.

Finally, while the COVID-19 virus is new, arguments based primarily on health concerns are not. Courts have generally recognized that "it is a rare case in which health conditions present an exceptional reason" to allow for release where otherwise detention would be warranted. *United*

*States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (quotations omitted). The U.S. Attorney General's March 26, 2020 memorandum related to the "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic" does not change this calculus. As noted by the memorandum (*see* Exhibit A), "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *Id.* As part of the analysis in assessing whether inmates should be granted home confinement, BOP was encouraged to look at, among other factors, the "age and vulnerability" of the inmate; the inmate's criminal history; whether the inmate has "demonstrated a verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions . . . upon release would present a lower risk of contracting COVID-19 than . . . in his or her BOP facility"; and the assessment of the danger posted by the inmate to the community. *Id.* The government's filing does just that. Notably, the March 26, 2020 memorandum also counsels that "before granting any inmate discretionary release, the BOP *Medical Director* . . . will, based on CDC guidance, make an assessment of the inmate's risk factors for *severe* COVID-19 illness, risks of COVID-19 at the . . . facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement." *Id.* (Emphasis Added). The defendant's request generally summarizes the risk of COVID-19, but in no way establishes the high bar described above, and how his placement in the community would benefit both him *and* the community.[10]

The government appreciates the gravity of this global pandemic and is committed to

---

[10] *See id.* ("You should grant home confinement only when BOP has determined . . . that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19").

ensuring the safety and health of inmates like the defendant. But at this stage and at this time, based on the information provided by DOC, DOC appears dedicated and willing to address this public health crisis and no amount of bombastic rhetoric can yet affect that judgment.[11] Whether the Court analyzes this case under the "compelling reason" language of 18 U.S.C. § 3142(i) or the "exceptional reason" standard of 18 U.S.C. § 3145(c), the defendant cannot demonstrate that his release benefits the community. Moreover, the existence of the COVID-19 pandemic can certainly factor into this analysis, but it cannot be dispositive, without more. Thousands upon thousands of Americans will be affected by this crisis, both inside and outside of detention facilities. The inquiry before this Court, today, is whether the Court can trust the defendant's safe return to Court regardless. Respectfully, that answer is no.

WHEREFORE the United States respectfully submits that Defendant's Second Emergency Motion for Bond Review (Docket Entry 23) be DENIED without a hearing.

                                                Respectfully submitted,

                                                TIMOTHY J. SHEA
                                                United States Attorney
                                                D.C. Bar No. 437437

By:    */s/ James B. Nelson*
        JAMES B. NELSON
        D.C. Bar No. 1613700
        Assistant United States Attorney
        Violent Crime & Narcotics Trafficking Section
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-6986
        james.nelson@usdoj.gov

---

[11] The U.S. Attorney's Office continues consulting with the DOC on a frequent basis in light of the rapidly-changing situation.

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on April 2, 2020.

By:    */s/ James B. Nelson*
        JAMES B. NELSON
        D.C. Bar No. 1613700
        Assistant United States Attorney
        Violent Crime & Narcotics Trafficking Section
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-6986
        james.nelson@usdoj.gov