# ATTACHMENT A

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1. I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health. I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2. I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

**The nature of COVID-19**

3. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US. As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection. The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again, is likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

### The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain.  It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release.  Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.


_____
Professor Chris Beyrer[1]


---

[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

**References**

Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No abstract available.
PMID: 27427447.

Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. American Journal of Public Health. 2009 October; 99(Suppl 2): S339–S344.

Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151

# ATTACHMENT B

Declaration of Robert B. Greifinger, MD

I, Robert B. Greifinger, declare as follows:

1. I am a physician who has worked in health care for prisoners for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2. I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

3. COVID-19 is a coronavirus disease that has reached pandemic status. As of today, according to the World Health Organization, more than 132,000 people have been diagnosed with COVID-19 around the world and 4,947 have died.[2] In the United States, about 1,700 people have been diagnosed and 41 people have died thus far.[3] These numbers are likely an underestimate, due to the lack of availability of testing.

4. COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

5. People in the high-risk category for COVID-19, i.e., the elderly or those with underlying disease, are likely to suffer serious illness and death. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

[2] See https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed March 13, 2020.

[3] See https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed March 13, 2020.

6. Those who do not die have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that will likely be in very short supply.

7. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

8. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy. At least one nursing home in the Seattle area has had cases of COVID-19 and has been quarantined.

9. The Seattle metropolitan area, hit hard by COVID, is the epicenter of the largest national outbreak at this time. Therefore, it is highly likely, and perhaps inevitable, that COVID-19 will reach the immigration detention facility in Tacoma, Washington. Immigration courts and the ICE field office in Seattle have already closed this month due to staff exposure to COVID-19.

10. The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions.

11. Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

12. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

13. The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks

to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

14. To the extent that vulnerable detainees have had exposure to known cases with laboratory-confirmed infection with the virus that causes COVID-19, they should be tested immediately in concert with the local health department. Those who test negative should be released.

15. This release cohort can be separated into two groups. Group 1 could be released to home quarantine for 14 days, assuming they can be picked up from NWDC by their families or sponsors. Group 2 comprises those who cannot be easily transported to their homes by their families or sponsors. Group 2 could be released to a housing venue for 14 days, determined in concert with the Pierce County or Washington State Department of Health.


Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14th_ day in March, 2020 in New York City, New York.


Robert B. Greifinger, M.D.

# ATTACHMENT C

<u>**Declaration of Dr. Jaimie Meyer**</u>

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

## I.     **Background and Qualifications**

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine. I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut. In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility. Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. In 2017-2018, I volunteered to run monthly AIDS awareness programming at Danbury FCI and FSL federal prisons for women in Danbury, Connecticut. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole). I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others. I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I am being paid $200 per hour for my time reviewing materials and preparing this report.

6. I have not testified as an expert at trial or by deposition in the past four years.

7. I have been asked by the Public Defender Service for the District of Columbia to review and comment on materials in connection with a case to be filed on behalf of certain incarcerated individuals who are at an increased risk of contracting and developing complications from exposure to COVID-19. I was specifically asked to comment on jail conditions during and preparedness for the COVID-19 pandemic.

8. In addition to my knowledge, training, education, and experience in the field of prison healthcare and infectious diseases, and the resources relied upon by experts in infectious diseases and prison health, I also reviewed specifically the Centers for Disease Control and Prevention (CDC) guidance on management of COVID-19 in correctional facilities (available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html), the Bureau of Prisons (BOP) modified operations plan (available at https://www.bop.gov/coronavirus/covid19_status.jsp), the National Commission on Correctional Health Care (NCCHC) materials on COVID-19 (available at https://www.ncchc.org/COVID-Resources), and the World Health Organization interim guidance on Preparedness, prevention and control of COVID-19 in prisons and other places of detention (available at http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1).

## II. Heightened Risk of Epidemics in Jails and Prisons

9. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

10. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

11. <u>Reduced prevention opportunities.</u> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through

droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

12. <u>Disciplinary segregation or solitary confinement facilities is not an effective disease containment strategy.</u> Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff. Because incarcerated people may perceive quarantine as punitive, or as a living arrangement that allows fewer privileges than their regular housing, incarcerated people may be deterred from self-reporting symptoms to medical staff. As a result, they may remain in congregate settings while infected, potentially transmitting infections to others.

13. <u>Reduced prevention opportunities.</u> During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

14. <u>Reduced prevention opportunities.</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

15. <u>Increased susceptibility.</u> People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

16. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease</u>

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

<u>outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

17. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

18. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

19. <u>Health safety.</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

20. <u>Safety and security.</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

21. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

## III. Profile of COVID-19 as an Infectious Disease[4]

22. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to nor developed protective responses against this virus. A vaccine is currently in development but will likely not be available for at least another year to the general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for use in clinical trials. People in prison and jail will likely have even less access to these novel health strategies as they become available.

23. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6] Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially

---

[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.

[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.* The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext

when they have not received the influenza vaccine or the pneumonia vaccine.

24. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

25. COVID-19 prevention strategies include containment and mitigation. Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Jails and prisons are totally under-resourced to meet the demand for any of these strategies. As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease. Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

26. The time to act is now. Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19. To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in place. Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

**IV.    Risk of COVID-19 in the D.C. Department of Corrections' ("D.C. DOC") Correctional Treatment Facility and Central Detention Facility ("D.C. jails")**

27. In making my assessment of the danger of COVID-19 in the District of Columbia jails, I have reviewed the following reports and declarations:
    i. Reports published following local government inspections of the DC jails:
        • District of Columbia Corrections Information Council, "DC Department of Corrections Inspection Report" (published May 21, 2019);
        • Office of the District of Columbia Auditor, "Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks" (published February 28, 2019)

---

[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance- management-patients.html.

    **ii.**    Report resulting from a non-profit agency inspection of the DC jails:
- Washington Lawyers' Committee for Civil Rights and Urban Affairs, "D.C. Prisoners: Conditions of Confinement in the District of Columbia" (published June 11, 2015)

    **iii.**    Declarations from those living and working within the DC jails:
- CTF inmates Keon Jackson and Eric Smith
- CDF inmates D'Angelo Phillips and Edward Banks
- Public Defender Service staff who entered the jail facilities to meet with clients and who have conducted phone interviews with clients regarding conditions within the jails:
  - Division Chief Jonathan Anderson;
  - Supervising Attorney Joseph Wong;
  - Supervising Attorney Ieshaah Murphy;
  - Staff Attorney Daniel Pond;
  - Staff Attorney Rachel Cicurel;
  - Staff Attorney Ronald Resetarits;
  - Staff Attorney Kavya Naini;
  - Investigative Intern Eileen Johnson;
  - Investigative Intern Katherine Kuenzle;
  - Investigative Intern Samuel Cyphers;
  - March 25, 2020 Fraternal Order of Police Department of Corrections Labor Committee Letter to Quincy L. Booth

28. Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. In addition, the practices and resources of CDF and CTF with regard to sanitation and other policies, as reflected in the declarations of CDF and CTF inmates who have resided in these facilities in March 2020 and the declarations of the PDS attorneys who have visited these facilities in March 2020, lead me to conclude, in my professional judgment, that the inmates, visitors, and employees of these facilities are at imminent risk of contracting COVID-19. Further, based on these same declarations, it is my professional judgment that, now that there is at least one positive case of COVID-19 within the CDF and CTF facilities, the chances are extremely high that most or all of the other inmates of, visitors to, and employees at that facility will contract it as well. Finally, it is my professional judgment that, because of the high likelihood that inmates, visitors, and employees of CDF and CTF will contract COVID-19, combined with the state of limited medical care for inmates at these facilities, any inmate of these facilities who contracts COVID-19 faces a serious and substantial risk of death from COVID-19. The reasons for this conclusion are detailed as follows.[8]

---

[8]    In the below section, summaries of CDC guidance and general clinic recommendations

a. **General Prevention Practices**

i. **Cleaning and Disinfecting Practices:** Because the SARS-CoV-2 virus (that causes COVID-19 disease) can survive on inanimate objects, high-touch surfaces (including doorknobs, light switches, countertops) should be regularly disinfected with bleach. The CDC recommends cleaning and disinfecting, several times per day, surfaces that are not ordinarily cleaned daily, including doorknobs, light switches, countertops, sink handles, recreation equipment, telephones, kiosks. At least several times per day, staff should clean and disinfect shared equipment, including radios, service weapons, keys, and handcuffs.

*Even before the COVID-19 pandemic, CDF and CTF facilities were described, in a mix of government reports, audits and declarations, as being unsanitary and unhygienic with crumbling physical infrastructure. These conditions will contribute to the rapid spread of COVID-19 within the facility, in the absence of adequate cleaning and disinfecting protocols. Declarations from people incarcerated at CDF and CTF facilities reflect that inmates are provided with rare bottles of Windex to clear their cells, which contains 4% isopropyl alcohol, as compared to the 70% alcohol-containing products or bleach needed to disinfect, per CDC recommendations. In fact, since Windex contains 28% ammonia, it could actually be harmful if mixed with bleach because the reaction generates chlorine gas that irritates the respiratory tract, eyes, and skin.*

ii. **Hygiene:** Prevention of COVID-19 requires that people have access to soap, private sinks, and clean water for handwashing or alcohol-based hand sanitizers.

*Failure to provide CDF and CTF inmates with a consistent and free supply of hygienic products (including soap and hand sanitizer) will increase the rate at which COVID-19 spreads around these facilities, because hand washing is one of the most effective ways to prevent spread of the virus. Yet declarations from people currently incarcerated in these facilities reflect no access to alcohol-based sanitizers and completely inadequate provision of no-cost soap.*

iii. **Personal protective equipment (PPE):** CDC recommends that "all staff and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained correctly to don, doff, and dispose of PPE." In this case, PPE includes gowns, gloves, face masks, respirators, and eye shields or goggles. N95 respirators require special fit testing and people with facial hair need special accommodations because they cannot achieve a tight enough seal with N95 respirators. Inmates involved in cleaning, laundry, and meal service also need to be trained in how to don and doff personal protective equipment.

---

are followed by a discussion in *italics* of how these guidelines apply to the District of Columbia Department of Corrections.

*The lack of personal protective equipment ("PPE") for both D.C. DOC staff and inmates, as described in the declarations of inmates and attorneys, will result in increased risk of COVID-19 infection. Even if PPE is accessible for CDF and CTF staff, it does not appear from PDS staff declarations that staff have been using PPE. This is also likely to increase the spread of the virus, as even asymptomatic people can transmit the virus. Of particular concern is the lack of PPE for staff who interact with the many visitors that cycle in and out of the facilities.*

*Inmates assigned to cleaning duties are also not provided appropriate PPE, resulting in high risk of contracting COVID-19. The DOC Labor Committee Letter reflects that Correctional Officers who requested PPE to extract inmates who are possible COVID-19 infected and bring them to isolation or quarantine were removed from duty. This is completely unacceptable and will undoubtedly result in COVID-19 infections in the facility and harm to inmates and staff. Absent from the documents I reviewed is any mention of planning for shortages for PPE or training staff on how to use PPE. This is critical because, without training, staff risk exposing themselves and inmates to COVID-19 infection when donning and doffing equipment.*

**b. Screening:** COVID-19 is a virus that spreads easily, primarily from person-to-person through respiratory droplets. It is therefore imperative that people entering closed confinement settings like prisons are properly screened to ensure that they do not bring the virus into the facility. Research suggests that people who are ill with COVID-19 and experiencing symptoms are most likely to transmit the virus to others. The virus can be transmitted very efficiently from person to person within 6 feet, putting staff and inmates at risk of becoming infected unless proper infection prevention and control strategies are implemented.

**i. Screening Inmates:** Current CDC guidance suggests screening should consist of two questions: "1) Today or in the past 24 hours, have you had any of the following symptoms: fever/felt feverish/had chills; cough; difficulty breathing; 2) In the past 14 days have you had contact with a person known to be infected with COVID-19?"

*There is no description in any of the documents I reviewed, that inmates are being screened for COVID-19 on intake. After completing screening, people without symptoms or temperature but who have been exposed to COVID-19, should be quarantined for 14 days to monitor for signs and symptoms of infection. Declarations from inmates suggest quarantining after exposure is occurring but for only 1 week. This premature release from quarantine will likely result in people with COVID-19 infection entering the general population in the facility and infecting others. Given that the average person with COVID-19 infection transmits the disease to 2-3 others (in the best of circumstances in the community*

*where social distancing is possible), this will likely result in the disease spreading through the facility like wildfire.*

ii. **Screening Staff:** CDC recommends verbally screening all staff daily on entry into the facility for COVID-19 symptoms and close contact with cases, and temperature checks.

*It is unclear from the documents I reviewed whether this is occurring, if at all. Per the DOC Labor Committee Letter, there has been no attempt to reassign staff who are at high-risk for COVID-19 themselves, putting staff at high risk of contracting the disease and transmitting to other staff and inmates residing inside the facility.*

iii. **Screening Visitors/Vendors/Contractors:** According to the CDC, visitors and volunteers should also complete verbal screening procedures and temperature checks on entry into the facility.

*The screening procedures described in the PDS staff declarations are insufficient to mitigate the risk that the virus will enter. Of particular concern is the lack of PPE for staff who interact with the many visitors that cycle in and out of the facilities delay; the inadequacy of the visitor screening program to identify asymptomatic carriers and the use of faulty equipment to recognize even symptomatic visitors will all but guarantee that someone infected with COVID-19 will enter the facilities. While some attempts have been clearly made to introduce a screening questionnaire, the questions used are outdated because they still focus on travel screening which has become a moot point in light of widespread community outbreaks, and thus do not align with CDC recommendations. The vast deficits in the screening process is especially important in DC jails, where medical care providers and contractors. If a medical care provider is infected with COVID-19, there is still the high likelihood that they will be able to enter the facility and can infect inmates with whom they have direct patient care contact.*

c. **Social distancing:** When containment strategies become overwhelmed, mitigation strategies require people to practice social distancing. CDC recommends the following strategies: Meals can be staggered, and seating be rearranged in dining halls and common areas (like waiting areas) to enable social distancing, such as removing every other seat. Alternatively, meals could be provided in housing units. Mitigation strategies must be in place for other highly congregate settings, such as recreation, group activities, educational classes, vocational training, and religious services.

*The lack of ability to practice social distancing in the CDF and CTF is also concerning and will the increase rate of spread of the virus. Continuing programming in groups of 30, as one inmate described in his declaration, will inevitably result in increased spread of the virus. The description by another inmate about inmates dipping their hands and cups into a communal cooler of juice also suggests that D.C. DOC is not enforcing even basic social distancing protocols. This is compounded by congregate housing units, in*

*which 40-50 men are sleeping in a single unit, many of whom have respiratory symptoms that are consistent with COVID-19 infection. CDF and CTF facilities are described, in a mix of government reports, audits and declarations as poorly ventilated with overwhelmingly communal shared spaces that are poorly ventilated. This scenario makes social distancing practices impossible, contributing to the rapid spread of COVID-19 once it enters a facility. The ventilation conditions described in the District of Columbia's Auditor's report is also concerning and will increase the rate of spread of the virus. The Department of Corrections' response to the Auditor's report includes D.C. DOC's own conclusion that the "current HVAC system has significant design problems that inhibit proper airflow." Because the virus can spread in an airborne state, ventilation is an important mitigator for the spread of the virus.*

**d. Management of the disease in the facility:** People who have been diagnosed with COVID-19 (either because they exhibit consistent symptoms or because they obtained a positive test), need to be medically isolated to prevent the virus from being transmitted to other people in the facility population. Importantly, medical isolation differs from disciplinary segregation. It should be used as a public health measure that also attends to the medical needs of the individual; not used to deprive them of all freedom of movement. Ideally, people with COVID-19 will be medically isolated near medical units where they can receive clinical care and attention. In people who are older (>65) and with underlying medical conditions, the disease can progress extremely rapidly, so medical attention is critical.

*The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected. The descriptions by inmates that there are day-long delays to see medical staff is highly concerning and will increase the risk of infection-related morbidity and mortality. The District of Columbia's Auditor's observation that the Department of Health does not conduct any inspections of the CTF is troubling, as regular compliance checks are essential to determining whether medical care is adequate.*

    i.   **Sufficiency of isolation spaces**: Prisons are built to contain people, not diseases. Given how COVID-19 outbreaks have overwhelmed even the most sophisticated hospital systems nationwide, it is unlikely that the D.C. DOC will be adequately equipped or supported once someone in the facility becomes ill with COVID-19. Even mild disease requires close monitoring and that caregivers and/or healthcare personnel have personal protective equipment (PPE), including gloves, gowns, eye shields, and masks, that are not usually available in the D.C. DOC or are potentially in limited supply. Airborne isolation rooms are specially equipped with negative pressure to allow air flow from outside the room to inside. These negative pressure rooms should be used for people with diagnosed or suspected COVID-19 who have more severe disease or are at high risk of aerosolizing droplets (e.g. they are coughing frequently).

A COVID-19 outbreak poses particular risk to people with underlying chronic health conditions, including heart disease, lung disease, liver disease, pregnancy, diabetes, and suppressed immune systems. They have higher risk of becoming infected with COVID-19 if exposed and higher risk of complications and death if infected. People also need continuous access to treatment for their other underlying health conditions, which are at risk during a COVID-19 pandemic in the context of healthcare understaffing and reduced access to medications (if supply chains are interrupted).

*The 2019 D.C. Auditor report suggests there is a single medical isolation space in CTF with negative pressure capacity, located in the Medical 82 unit. The same report noted that, at the time of the audit, the remainder of the 40 beds were nearly entirely filled (at 73% capacity), which would leave few beds available for COVID-19 patients. To say this is unacceptable is an understatement. Given that, as of March 27, 2020 there are around 1600 individuals in D.C. DOC custody, that means approximately 1600 individuals would rely on that single isolation room if they became infected with COVID-19. Clearly demand would outpace need. Individuals who could not be isolated in single spaces could be isolated in cohorts, but only if testing were widely available in the facility, which does not appear to be the case. These issues will culminate in people with COVID-19 infection: 1) remaining in communal settings to easily transmit to everyone in their housing unit or 2) requiring transfer to area hospitals, which will likely also be limited in the context of a community-wide outbreak. Limited bed space may also mean that inmates and staff will be deterred from reporting their symptoms, potentially delaying medical attention and resulting in preventable complications and possibly death.*

ii. **Medical care for other health conditions:** Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention. Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes. Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

*The commonplace neglect of, and delay in providing treatment to, individuals with acute pain and serious health needs under ordinary circumstances is also*

*strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under- prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic. The statement by two inmates that it can take "days" to receive medical attention is strong evidence that D.C. DOC is seriously ill-equipped and under-prepared, as the COVID-19 outbreak will require D.C. DOC to provide medical attention to a large number of people at once.*

29. The above examples illustrate that the D.C. DOC remains unprepared to address the current COVID-19 pandemic. As the CDC acknowledges, even a prison operating precisely under its guidelines would be a far more dangerous environment than the community, given the mayor's directive to remain at home and business and school closures in place.

30. D.C. DOC's inability to adequately contain and treat COVID-19 is especially concerning for higher risk individuals, such as older adults and people with chronic illnesses such as diabetes, liver disease, pregnancy, heart disease, and lung disease. People with these particular characteristics are most susceptible to becoming seriously ill or even dying should they become infected with COVID-19.

31. There is true urgency to act on these facts now. Data from the US during other infectious disease outbreaks (e.g. influenza) and data from other countries during COVID-19 show that when prison systems are unprepared for pandemics, people in prison experience much higher rates of morbidity and mortality than even affected communities. Such crises within prisons endanger communities as a whole by increasing the overall number of cases and increasing pressure on hospitals. There is no current approved vaccine or antiviral medication treatment for COVID-19 so public health preparedness is the only tool we have.

32. Inadequate screening and testing procedures in facilities, including failing to test inmates who have demonstrated symptoms of COVID-19, increase the widespread COVID-19 transmission.

## V. Conclusion and Recommendations

33. **The declarations provided by people currently incarcerated in CDF and CTF are alarming and make clear that conditions in the DC jails during this pandemic are dangerous.** It is my professional judgment that individuals placed in these jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These significantly higher risks include an elevated risk of serious illness (pneumonia and sepsis) and death. DC jails are ill-equipped to prevent COVID-19 from entering its facilities and woefully unprepared to prevent its spread within the facility.

34. Reducing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large.

35. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in DC jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

36. This is especially important for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 65. Nonetheless, it remains the case, given the conditions in the DC jails, that everyone in the CDF and CTF is right now at serious risk of contracting COVID-19 and, if that occurs, of dying from it.

37. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for rapid and severe COVID-19 spread in these facilities is a matter of hours not days. Once a case of COVID-19 is identified in a facility, it is only a matter of time until there is a widespread outbreak. In the past several days, first one, then two, and now four, inmates in D.C. DOC custody have tested positive for COVID-19 with many inmates reportedly in quarantine. More cases are sure to follow because of under-resourced, under-staffed, or minimally implemented infection prevention and control measures.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Dr. Jaimie Meyer

March 29, 2020
Wilton, Connecticut

# ATTACHMENT D

RE:      **COVID-19 Risks for Detained Populations in Maryland from a group of concerned scientists, physicians, and public health experts**

To the Honorable Judges of the Maryland District and Circuit Courts, state and local corrections departments:

We write as a group of concerned physicians and public health experts strongly urging the Maryland court system to address the ongoing global health pandemic by swiftly implementing the following recommendations:

1) **Immediately implement community-based alternatives to detention to alleviate potential exposure to COVID-19 in jails and prisons; and**

2) **Incarcerate as few people as possible in order to mitigate the harm from a COVID-19 outbreak. Detained populations are at high risk to contract a virus like COVID-19 which spreads through respiratory droplets.**

## I.   <u>Coronavirus Pandemic</u>

In light of the rapid global outbreak of the novel coronavirus disease 2019 (COVID-19), we want to bring attention to the serious harms facing individuals in detention facilities in Maryland. The United States Department of Health and Human Services Secretary Alex Azar declared a public health emergency on January 31, 2020, and Governor Larry Hogan declared a public health emergency in Maryland on March 5, 2020. The state of Maryland has since closed all schools, restaurants and other places of public gathering. The courts have halted regular judicial activity with the exception of emergency matters.

As of March 18, 2020, there have been over 210,000 confirmed cases worldwide with over 8,900 deaths. The US has over 7,500 confirmed cases with 117 deaths. Maryland has 85 confirmed cases and one death. **Public health experts expect the number of confirmed cases to rise exponentially and warn that the situation in the U.S. will get worse before improving.**

## II.    Public Health Conditions in Detention Facilities Already Poor

Detention facilities are designed to maximize control of the incarcerated population, not to minimize disease transmission or to efficiently deliver health care. For these reasons, transmission of infectious diseases in jails and prisons is incredibly common, especially those transmitted by respiratory droplets. It is estimated that up to a quarter of the US prison population has been infected with tuberculosis[1], with a rate of active TB infection that is 6-10 times higher than the general population.[2] **Flu outbreaks are regular occurrences in jails and prisons across the United States.[3],[4] With a mortality rate 10 times greater than the seasonal flu and a higher R0 (the average number of individuals who can contract the disease from a single infected person)[5] than Ebola, an outbreak of COVID-19 in detention facilities would be devastating.**

## III.    Risks of a COVID-19 Outbreak in Detention

Emerging evidence about COVID-19 indicates that spread is mostly via respiratory droplets among close contacts[6] and through contact with contaminated surfaces or objects. Reports that the virus may be viable for hours in the air and on surfaces are particularly concerning.[7] Though people are most contagious when they are symptomatic, transmission has been documented in the absence of symptoms. We have reached the point where community spread is occurring in the U.S. The number of cases is growing exponentially, and health systems are already being strained.

**Social distancing measures recommended by the Centers for Disease Control (CDC)[8] are nearly impossible in detention facilities and testing remains largely unavailable**. In facilities that are already at maximum capacity large-scale quarantines may not be feasible. Isolation may be misused and place individuals at higher risk of neglect and death. COVID-19 threatens the well-being of detained

individuals, as well as the corrections staff who shuttle between the community and detention facilities.

Given these facts, it is only a matter of time before we become aware of COVID-19 cases in a detention setting in which inmates live in close quarters, with subpar infection control measures in place, and whose population represents some of the most vulnerable. **In this setting, we can expect spread of COVID-19 in a manner similar to that at the Life Care Center of Kirkland, Washington, at which over 50% of residents have tested positive for the virus and over 20% have died in the past month.** Such an outbreak would further strain the community's health care system.

**In about 16% of cases of COVID-19, illness is severe including pneumonia with respiratory failure, septic shock, multi-organ failure, and even death.** Some people are at higher risk of getting severely sick from this illness. This includes people who have serious chronic medical conditions like asthma, lung disease, diabetes, and those who are immunocompromised. There are currently no antiviral drugs licensed by the U.S. Food and Drug Administration (FDA) to treat COVID-19, or post-exposure prophylaxis to prevent infection once exposed.

## IV.    <u>Maryland Jails are No Exception</u>

Like many states, Maryland has moved into the community transmission phase of this pandemic, and has seen a spike in cases in just over a few days. As courts continue to hear bond hearings and other emergency matters, it is critical that the population of detained people be reduced as much as possible and that extra steps are taken to protect those who are or will remain incarcerated.

Public defenders report that in one jurisdiction, people are brought to bond review hearings in shackles, chained together in close proximity. In other jurisdictions, detained people are crammed into small spaces as they await their bond hearings. Jails and courts should immediately put an end to these practices. Public defenders have also reported that judges are detaining some people on cash bonds that they cannot afford even in cases where there is no public safety threat. Where there is no public safety threat, courts must prioritize public health, and release low-income people

without financial conditions. In addition, in some facilities across the state, detained people must pay a fee to make medical calls—this, in addition to limiting access to soap and hand sanitizer, are practices that jeopardize the individual and collective health of those in jail, including staff. While we are encouraged to hear that some jails are working with the prosecutor and public defender offices to identify vulnerable populations, including the elderly and those with pre-existing conditions, we urge all jurisdictions to take these steps and act swiftly.

This public health crisis requires each and every one of us to re-evaluate how we conduct our lives and care for one and other. Institutions responsible for the care and custody of incarcerated individuals must take unique steps to "flatten the curve" and slow the spread of this virus. We strongly recommend that the courts implement community-based alternatives to detention to alleviate potential exposure in jails. Incarcerating as few people as possible will help mitigate the harm from a COVID-19 outbreak.

Sincerely,

Maryland State Medical Society

Richard Bruno, MD, MPH
Board Certified, Family Medicine
Board Certified, Preventive Medicine
Chair, Public Health Committee, MedChi (Maryland State Medical Society)

Chris Beyrer, MD, MPH
Professor of Medicine, Division of Infectious Diseases,
Johns Hopkins School of Medicine
Johns Hopkins Bloomberg School of Public Health

Andrea Wirtz, PhD, MHS
Assistant Scientist of Epidemiology
Johns Hopkins Bloomberg School of Public Health

Ju Nyeong Park, PhD, MHS
Assistant Scientist
Johns Hopkins Bloomberg School of Public Health

Emily Wang, MD, MA
Assistant Professor of Internal Medicine
Yale School of Medicine

Tracy Rabin, MD, SM
Assistant Professor of Internal Medicine
Yale School of Medicine

Leonard Rubenstein, JD, LLM
Senior Scientist
Johns Hopkins Bloomberg School of Public Health

Gabriel B. Eber, JD, MPH
Senior Associate
Johns Hopkins Bloomberg School of Public Health

Jonathan Giftos, MD, AAHIVS
Medical Director, Addiction Medicine & Drug User Health
Project Renewal, Inc.

Theodore Cohen, MD, MPH, DPH.
Professor of Epidemiology
Yale School of Public Health, Department of Epidemiology of Microbial Diseases

Lee W. Riley, MD
Professor and Head, Division of Infectious Disease and Vaccinology
University of California Berkeley, School of Public Health

Albert Ko, MD
Professor of Epidemiology, Infectious Disease; and Professor of Public Health
Yale Medical School and Yale School of Public Health

Gregg Gonsalves, PhD
Assistant Professor of Epidemiology of Microbial Diseases
Yale University School of Medicine and the Graduate School

Benjamin A. Howell, MD, MPH, MHS
National Clinician Scholars Program Fellow
Yale School of Medicine and Health Justice Lab

Gerald Friedland, MD

Professor Emeritus of Medicine, Epidemiology and Public Health and Senior Research Scientist
Yale School of Medicine and Public Health

Carrie Redlich, MD, MPH
Professor, Department of Medicine
Yale School of Medicine

Eva Raphael, MD, MPH
Clinical Research Fellow
University of California, San Francisco

[1] Hammett TM, Harmon MP, Rhodes W. The burden of infectious disease among inmates of and releases from US correctional facilities, 1997, *Am J Public Health*, 2002, vol. 92 (pg. 1789-94)

[2] Centers for Disease Control Prevention (CDC). Prevention and control of tuberculosis in correctional and detention facilities: recommendations from CDC, *MMWR Morb Mortal Wkly Rep*, 2006, vol. 55 (pg. 1-48)

[3] Dober, G. Influenza Season Hits Nation's Prisons and Jails. *Prison Legal News*, June, 2018 (pg. 36) https://www.prisonlegalnews.org/news/2018/jun/5/influenza-season-hits-nations-prisons-and-jails/

[4] Pandemic influenza and jail facilities and populations, Laura Maruschak, et. al., American Journal of Public Health, September 2009

[5] The R0 is the reproduction number, defined as the expected number of cases directly generated by one case in a population where all individuals are susceptible to infection.

[6] Close contact is defined as—
a) being within approximately 6 feet (2 meters) of a COVID-19 case for a prolonged period of time; close contact can occur while caring for, living with, visiting, or sharing a health care waiting area or room with a COVID-19 case
b) having direct contact with infectious secretions of a COVID-19 case (e.g., being coughed on)

[7] https://www.medrxiv.org/content/10.1101/2020.03.09.20033217v1.full.pdf

[8] https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html

# ATTCHMENT E

**Declaration of Dr. Marc Stern**

I, Marc Stern, declare as follows:

1.      I am a physician, board-specialized in internal medicine, specializing in correctional health care. I most recently served as the Assistant Secretary for Health Care at the Washington State Department of Corrections. I also have considerable familiarity with the immigration detention system. I served for four years as a medical subject matter expert for the Officer of Civil Rights and Civil Liberties, U.S. Department of Homeland Security, and as a medical subject matter expert for one year for the California Attorney General's division responsible for monitoring the conditions of confinement in Immigration and Customs Enforcement (ICE) detention facilities. I have also served as a consultant to Human Rights Watch in their preparation of two reports on health-related conditions of confinement in ICE detention facilities. In those capacities, I have visited and examined more than 20 ICE detention facilities and reviewed hundreds of records, including medical records and detention death reviews of individuals in ICE detention. Attached as Exhibit A is a copy of my curriculum vitae.

2.      COVID-19 is a serious disease and has reached pandemic status. At least 132,758 people around the world have received confirmed diagnoses of COVID 19 as of March 13, 2020, including 1,629 people in the United States. At least 4,955 people have died globally as a result of COVID-19 as of March 13, 2020, including 41 in the United States. These numbers will increase, perhaps exponentially.

3.      COVID-19 is a novel virus. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has immunity. The only way to control the virus is to use preventive strategies, including social distancing.

4.      The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that.

5.      The effects of COVID-19 are very serious, especially for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as – but not limited to – weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy.

6.      Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs. Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support. An outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure.

7.      Detention facilities are congregate environments, i.e. places where people live and sleep in close proximity. In such environments, infectious diseases that are transmitted via the air or touch are more likely to spread. This therefore presents an increased danger for the spread of COVID-

19 if and when it is introduced into the facility. To the extent that detainees are housed in close quarters, unable to maintain a six-foot distance from others, and sharing or touching objects used by others, the risks of spread are greatly, if not exponentially, increased as already evidenced by spread of COVID-19 in another congregate environment: nursing homes and cruise ships.

8. Social distancing in ways that are recommended by public health officials can be difficult, if not impossible in detention facilities, placing people at risk, especially when the number of detainees is high.

9. For detainees who are at high risk of serious illness or death should they contract the COVID-19 virus, release from detention is a critically important way to meaningfully mitigate that risk. Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility. Combined, this has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees.

10. The release of detainees, especially those with increased health-related vulnerability, also supports the broader community because carceral and detention settings, regardless of the level of government authorities that oversee them, are integral parts of the community's public health infrastructure. Reducing the spread and severity of infection in a Federal immigration detention center slows, if not reduces, the number of people who will become ill enough to require hospitalization, which in turn reduces the health and economic burden to the local community at large.

11. As a correctional public health expert, I recommend release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19.

12. Conditions related to COVID-19 are changing rapidly and may change between the time I execute this Declaration and when this matter appears before the Court. One of the most worrisome changes would be confirmation of a case of COVID-19 within the detention center, either among staff or detainees. In the event of this occurring, and eligible detainees being quarantined or isolated due to possible exposure to the virus, I recommend that the detainee(s) be tested for the virus if testing is available. Armed with the results of that test if it is available, or in the absence of other instructions from the health authority of the municipality to which they will be returning or the Washington State public health authority, those who can easily return to a home without exposure to the public, should be released to that home for continued quarantine or isolation for the appropriate time period. All others can be released to appropriate housing as directed or arranged in coordination with the relevant health authority.

13. I have reviewed Plaintiffs' complaint and on the basis of the claims presented, conclude that Plaintiffs have underlying medical conditions that increase the risk of serious illness or death if exposed to COVID-19. Due to the risks caused by the congregate environment in immigration

detention, compounded by the marked increase in risk conferred by their underlying medical conditions, I recommend their release.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this __15th___ day in March, 2020 in Tumwater, Washington.

_____

Dr. Marc Stern